[Civ. No. 6392. Third Appellate District.—September 14, 1940.]

CENTRAL HEIGHTS IMPROVEMENT COMPANY (a
 Corporation), Appellant, v. MEMORIAL PARKS, INC.
 (a Corporation), et al., Respondents.

Clyde C. Shoemaker for Appellant.

Paul E. Younkin, Howell Purdue and Arthur C. Webb for Respondents.

GEARY, J., *pro tem.*—Appellant, a California corporation, brought this action to recover the alleged unpaid purchase price of real property situated in Los Angeles County, and to have a vendor's lien declared and enforced thereon. The complaint alleged in substance that on or about April 14, 1933, respondents Clark and Glouner entered into an agreement for the benefit of respondent corporation to purchase twenty acres of land from appellant for a total price of $40,-000, upon which there had been paid the sum of $6,000. That thereafter Clark and Glouner transferred all their rights under the contract, as well as title to three acres of the land in question acquired by them, to respondent corporation, and the latter had assumed and agreed to pay the balance of $34,000 upon the purchase price, with interest according to the terms of the agreement of April 14, 1933. That on or about August 15, 1933, appellant, at the instance and request of respondents Clark, Glouner and Memorial Parks, Inc., conveyed the remaining seventeen acres of the land in question to respondent corporation; that no part of the balance of the purchase price therefor had been paid; that respondents are indebted for the balance of $34,000, with interest; that appellant had a vendor's lien on the seventeen acres for the unpaid purchase price, and prayed judgment accordingly.

At the conclusion of plaintiff's case, by stipulation, respondents, through respective counsel, filed separate amended answers to the complaint. Respondent corporation therein denied that the contract of April 14, 1933, between appellant and respondent Clark was entered into for its benefit, and that it had assumed and agreed to pay the balance of the purchase price mentioned therein. As a separate defense, respondent corporation alleged that respondent Clark had tendered to it his deed to the three acres to which he had acquired title and respondent had applied for a permit to issue stock pursuant to the agreement of April 14th between

appellant and Clark, but that the application had been denied. That thereafter and about June 29th, appellant, respondent corporation and Clark entered into a contract in writing, which by mutual agreement of appellant and Clark, modified the agreement of April 14th between the last-named parties. That pursuant to the agreement of June 29th, respondent corporation applied for and secured a permit to issue stock to appellant and respondent Clark in consideration of their respective deeds for three acres and seventeen acres of the land. That pursuant to such permit and the terms of the agreement of June 29th, stock was issued to Clark and appellant as consideration for their respective deeds; that following respondent corporation's acquirement of title to the land, and pursuant to the permit of the corporation commissioner, it had sold and issued approximately $39,000 worth of stock to the public; and that all the terms of the agreement of June 29th had been complied with by the parties thereto.

Respondent Clark denied that the contract of April 14, 1933, was entered into for the benefit of respondent corporation; alleged that by its express terms he was relieved of further liability thereunder; admitted that he and respondent Glouner incorporated respondent corporation, and that title to the twenty acres was transferred to respondent corporation, and alleged that title was transferred in consideration of stock in respondent corporation, and denied that either he or respondent corporation owed appellant therefor. As an affirmative defense Clark alleged that appellant, about June 29, 1933, had negotiated with respondent Glouner a modification of the agreement of April 14, 1933, and that the same was modified thereby and by virtue of an agreement made June 29, 1933, between appellant, the respondent corporation and Daniel Clark; that pursuant to the modified agreement of June 29, 1933, he, Clark, had deeded three acres theretofore acquired, and appellant deeded seventeen acres to respondent corporation in consideration of the issuance to appellant of 5,666 shares of the capital stock of the latter. Other allegations were substantially the same as those set forth in respondent corporation's amended answer.

Respondent Glouner admitted that he and Clark caused respondent Memorial Parks, Inc., to be incorporated, and that the latter contracted with, and agreed to pay appellant the

purchase price for the land in question. He further alleged
he was not a party to the agreement of April 14, 1933, other
than to accept the provision therein contained that all stock
to be issued to him pursuant thereto would be forfeited as
liquidated damages in the event respondents Memorial Parks,
Inc., or Clark, failed to comply with the provisions of said
agreement. That the commissioner of corporations refused
to issue a permit for the issuance of stock as provided in such
agreement, and the same was thereafter modified by the mu-
tual written agreement between appellant and respondent
Memorial Parks, Inc., and appellant and Glouner, which al-
leged agreements were attached as exhibits thereto; that all
the terms of said agreement have been fully complied with
by Glouner, and appellant was, by reason thereof, entitled
to take nothing by its action. Appellant filed demur-
rers, both general and special, to the amended answers, which
were overruled. The ruling was proper. A defendant, ap-
pearing separately, is not required to answer allegations in
the complaint which relate solely to other defendants. (*Hi-
bernia Sav., etc.,* v. *Dickinson,* 167 Cal. 616, 619 [140 Pac.
265]; Bancroft's Code Pleading, vol. 1, sec. 241.) By a
parity of reasoning, one of several defendants may allege
matters as an affirmative defense which are not available to,
or sought to be availed of by his codefendants. Although
the answer of respondent corporation goes far in alleging
evidentiary facts, no motion to strike was made. There were
sufficient allegations of ultimate facts to state a valid defense.
(*McCaughey* v. *Schuette,* 117 Cal. 223, 224, 225 [46 Pac.
666, 48 Pac. 1088, 59 Am. St. Rep. 176]; *Ahlers* v. *Smiley,*
11 Cal. App. 343, 346 [104 Pac. 997].)

The evidence discloses that appellant, a "closed" Cali-
fornia corporation, on November 29, 1932, and for many
years prior thereto, was the owner of real property in Los
Angeles County, a portion of which had been theretofore
dedicated and zoned for cemetery purposes. Upon that date
appellant, for a recited consideration of $2,000, gave Charles
M. Glouner, one of the respondents, an exclusive one hun-
dred and twenty day option to purchase twenty acres of its
land for the further sum of $38,000 to establish a memorial
park thereon. The option provided that $18,000 of the pur-
chase price was payable on or before one hundred and twenty
days from date, whereupon ten acres would be deeded to
the purchaser "outright"; the balance of $20,000 was pay-

able on or before three years from date, secured by a mortgage or trust deed upon the remaining ten acres of the twenty-acre tract. This option was not exercised in accordance with its terms.

Thereafter, on April 14, 1933, appellant, after further negotiations, entered into an agreement in writing with respondent Daniel B. Clark, an associate of Glouner, for the sale of the same property for cemetery purposes. This agreement granted Clark *"an option"* to purchase the twenty acres in question for a total purchase price of $40,000, receipt of $2,000 (theretofore paid by Glouner) on account thereof being therein acknowledged, the balance of the purchase price payable as follows: The sum of $4,000 payable on or before the 20th of April, 1933; the sum of $14,000 payable in twelve equal monthly instalments, commencing with the month of November, 1933, until the $14,000 was paid, and thereafter the sum of $1,000 per month until the entire purchase price had been paid. All of the balance of the unpaid purchase price was to bear interest at 7 per cent per annum, payable quarterly, in addition to the payments on the purchase price. Appellant agreed that upon the payment by Clark of the additional sum of $4,000, as provided therein, it would convey a free and unencumbered title to Clark of the three acres of the property particularly described therein.

In addition the agreement contained provisions of a rather unusual nature, the construction of which is so directly involved herein that we deem it advisable to set forth at length the substance of the same, which we have italicized in part. It was specifically agreed that Clark should forthwith organize a California corporation *for the establishment* of a cemetery upon all of the twenty acres of land described therein, and that he would, *pursuant to a permit* to be applied for from the state corporation commissioner, convey the above-mentioned three acres of real property, and all his right, title and interest in and under the agreement in question to the "Cemetery Corporation", when the same was organized.

That the capital of the Cemetery Corporation should consist of 10,000 shares of preferred stock, no par value, enjoying a preferential cumulative dividend of seventy cents per annum, payable semiannually, from and after January, 1934, and preferred as to any asset upon liquidation, at the rate

of $10 per share; and 20,000 shares of common stock of the par value of $1 per share.

That the preferred stock should not be entitled to vote, except upon the failure of the corporation to pay preferential dividends for a period of two consecutive years, in which event the preferred stock, as a class, should, for the remainder of the period of default in payment of dividends, elect a majority of the board of directors, and the common stock, as a class, electing the balance of the board.

That the articles of incorporation of the Cemetery Corporation should provide that upon payment of the entire corporate debt, the remaining assets, including the entire purchase price of the 20 acres, should be set aside to the retirement of the preferred stock at $10 per share, and that no dividend should be paid upon the common stock until such retirement of the preferred stock.

That the consideration Clark should receive from the Cemetery Corporation to be so organized by him, for his conveyance to it of the three acres of land he was to acquire, and his rights and interests under the agreement, should not exceed 1200 shares of the preferred and 1200 shares of the common stock, subject to the approval of the corporation commissioner.

That as a consideration for services theretofore, and to be thereafter rendered to the Cemetery Corporation by respondent Glouner, the application to the corporation commissioner should request permission to issue to him, one share of common stock for every share of preferred stock issued or sold, including the 1200 shares of preferred stock to be issued to Clark; and Glouner, as part of the consideration therefor, agreed that any and all shares issued to him—or his associates —pursuant to the terms of the permit of the corporation commissioner, should be deposited in escrow under an agreement between Glouner and the appellant-corporation; in the event the Cemetery Corporation should default in the performance of the terms and conditions of the agreement, and the appellant-corporation should terminate the same, then the stock issued to Glouner should be "forthwith transferred and delivered to Central Heights Improvement Company as liquidated damages for the injury suffered by the 'Company' by the failure of said Clark and/or his successor in interest, the Cemetery Corporation, to comply with the terms hereof".

That in the event appellant-corporation terminated the agreement by reason of the default of Clark and/or the Cemetery Corporation, and appellant became the owner and holder of the stock issued to Glouner, that when, and as the balance of the purchase price of $34,000 and interest and other charges thereon of the real property was realized by appellant from the Cemetery Corporation, appellant would surrender to the latter for cancellation all of the shares of common stock so held by it, together with such other shares as might be received by it under the corporation commissioner's permit.

That should Clark or the Cemetery Corporation be in default of any of the terms of the agreement, appellant could terminate the same after notice in writing of such default and thirty days continued default thereafter, whereupon, by declaration of default, the rights of Clark ''and/or the Cemetery Corporation'', except as otherwise provided, should cease and determine, and appellant *should become the owner of said shares of capital stock of the Cemetery Corporation issued to Glouner and as such stockholder in the Cemetery Corporation should proceed as such,* and the Cemetery Corporation should then proceed *to complete the purchase of the real property according to the terms of the agreement.*

That respondent Clark assumed no personal liability from and after the payment of the sum of $6,000 for the three acres in question, except to convey the same and all of his rights under the agreement to the Cemetery Corporation.

That upon the payment of $14,000 and the discharge of the other terms and conditions mentioned, and if the Cemetery Corporation were free of debt, it might, from surplus only, retire any or all its preferred stock.

Thereafter, and about April 21, 1933, Clark and his associates paid the further sum of $4,000 towards the purchase price of the real property, whereupon appellant conveyed a free and unencumbered title to the three acres to Clark. About April 27, 1933, Clark and Glouner proceeded to organize respondent Memorial Parks, Inc., a corporation, pursuant to the terms of the agreement. The legal work in connection with the formation of this corporation was performed by Rex B. Goodcell, and the incorporators were Clark, Glouner and C. Roy Hunter. Thereupon, respondent corporation filed its application with the corporation commissioner for a

permit to issue stock pursuant to the agreement between appellant and Clark, of April 14th. The application recited, by reference to exhibits attached, the terms of the agreement of April 14th, the acquirement of title to three acres by Clark pursuant thereto, and the tender of same to applicant, and declared the value of the three acres to be $2,000 per acre for ordinary purposes, and that having been zoned for cemetery purposes, the reasonable value thereof for such purposes was $4,000 per acre.

The stock plan agreed upon by appellant and Clark, however, encountered immediate difficulty when appraisers for the corporation commissioner fixed a value upon the land of but $250—$350 per acre instead of the $4,000 per acre claimed as the reasonable value thereof. Thereafter, a series of conferences were held between the officers of appellant and respondent corporations, in the offices of Rex B. Goodcell, attorney. Not a little attention is devoted in the briefs to the question for whom Goodcell was acting throughout these transactions. The evidence indicates that Goodcell's formal employment originated with the promoters, and his compensation was met by respondent corporation. It further appears, his conduct of the negotiations resulted—as is frequently the case—in a relationship of mutual trust and confidence in his ability and integrity upon the part of all the parties. That Goodcell discharged this trust with fidelity to all, appears beyond question. As a result of the conferences mentioned Goodcell, on June 19, 1933, addressed a letter to W. T. Bill, president of appellant-corporation. After reciting the difficulties encountered with the corporation commissioner, a modification of the original stock plan to meet his objections was therein suggested, in part as follows:

"By the terms of said contract, (of April 14, 1933), Central Heights Improvement Co. is now in the cemetery business, as indeed it was before that contract was executed, by reason of the dedication of the west ten acres of the twenty acres involved for cemetery purposes.

" . . . Under the circumstances, I am suggesting a modification of the said contract between Memorial Parks, Inc., and Central Heights Improvement Co. along the following lines. You will remember by the terms of the contract, Clark was to receive $12,000.00 worth of preferred stock for the

three acres; that the balance of $100,000.00 worth of stock was to be sold, a brokerage of 20% being paid thereon, which was designed to net the Corporation sufficient money to pay the balance of $34,000.00 due to Central Heights Improvement Co., and to fully develop the entire twenty acres. Further, should the promoters fail in making payment to the Central Heights Improvement Co., in accordance with the terms of the contract, the Improvement Co. was to step into the place of the promoters and carry on the project until they had received the full payment as provided by the terms of the contract. Such being the condition, I believe that the proposal herein made for the modification of the now (new) contract places the Central Heights Improvement Co. in about the same position it now occupies under the terms of the contract.

"Let Clark deed the three acres to Memorial Parks, Inc., and at the same time Central Heights Improvement Co. should deed the remaining seventeen acres of the proposed twenty acre cemetery to Memorial Parks, Inc., receiving as consideration for such deed such amount of the common shares of capital stock of Memorial Parks, Inc., as the Commissioner is willing to give; presumably approximately 7500 shares. Whatever amount of such common shares the Commissioner will authorize to be issued, but not less than 6000 shares, shall be divided into two parts: one-third thereof going to Clark, or his nominee, and two-thirds thereof going to Central Heights Improvement Co. (or some ratio of division upon which you may later agree), the common stock going to the Central Heights Improvement Co. to be escrowed for a period not to exceed five years, and to be returned to Messrs. Myers and Morrison, or their nominees, if during said period of five years said Central Heights Improvement Co. has received dividends, or has otherwise been paid, the sum of $34,000.00, plus interest at 7% per annum from the date of said deed. . . .

"You will remember that the preferred stock does not vote until dividends are in default for a period of two years. The small amount of proposed issued preferred shares would seem to make it incredible that such dividends could not be paid. Personally, on paper, the proposition looks very attractive, and we all know that cemeteries, when properly managed, have been great dividend-payers. Central Heights Improvement Co. has already received $6000.00 in cash and, as above

stated, it has already definitely dedicated ten acres of the property involved to cemetery purposes. . . .

"I forgot to state above that no further promotional shares should be issued, and all to the end that if those responsible for this cemetery idea are over-estimating the situation, they will ultimately receive no benefit whatsoever, but leave the entire property in the hands of the Central Heights Improvement Co. and Mr. Clark. I anticipate no difficulty at all in securing a permit along the lines herein suggested."

Within a few days thereafter, and following a further conference, C. T. Norwood, an officer of appellant, objected to the proposed amended plan in a letter to Goodcell, which read in part (italics ours):

"Mr. Bill and I have been talking this over, as to how it would work out on that basis, with 5000 shares issued to us, as was also suggested yesterday. Mr. Clark would receive one-half as much stock for his three acres as we would for our seventeen acres, which does not seem equitable. *On this basis it would take nearly 800 per cent in dividends to pay us out, to say nothing about the interest. This, to us, seems impossible, and would put us permanently into the cemetery business, where we only intended to be temporary. Under the former agreement our interest was recognized as an indebtedness and not as a stock interest.*

"We would be willing that the set-up be made on this basis, provided the dividends on Mr. Clark's stock be assigned to us until our $34,000.00 and interest is paid, at which time his stock would be returned to him, or his assigns. Under this arrangement we would be willing to deposit our stock in escrow to protect Mr. Clark's interest, if he so desired. Otherwise, we feel that only his proportionate share, 3/20, of the total stock issued to him and ourselves, should be issued to him, and our share should be 7/20 of the total. . . . The more common stock you can get the Commissioner to allow us, the better, as it gives us a larger proportion in relation to the bonus given with the preferred stock. Probably your set-up would call for one share of preferred stock to ten shares of common. . . . "

To which letter Goodcell addressed the following reply on June 26, 1933:

"I have your letter of June 22nd. We discussed all of the points brought up in your letter as to the portion of stock

which Mr. Clark would be receiving, and the Central Heights Improvement Co. would receive.

"Mr. Clark is not willing to assign to you the dividends on his stock until the $34,000.00 is paid. In viewing this situation, just remember the following facts: Clark paid $6000.00 in cash for three acres of ground which was included in the cemetery permit; he was to receive as consideration for deeding the three acres to the Cemetery Corporation 1200 shares of preferred stock, drawing 7%, and 1200 shares of common. The charter of the Corporation provides that no dividends shall be paid on the common until all of the preferred has been retired.

"Central Heights Improvement Co. was to get $34,000.00 and interest, supposedly to be paid out of stock sales, on a set-up which the Commissioner of Corporations refuses to approve because the price to be paid for the land was eight times as much as the State Appraiser fixed as the value of the land, permit and all included. Further, just remember under the terms of the contract, if the payments aren't made in accordance therewith, that the Improvement Co. takes over the promoters' stock and is in the cemetery business with its twenty acres, and obliged to carry on until the preferred stock is retired, before it can take anything in payment for its seventeen acres of land. I explained this in detail to Mr. Veach before the contract was signed, but assumed that the unusually onerous provisions of the contract were acceptable to the Improvement Co. because of the $6000.00 in cash being paid, and because of the high price which would have to be paid for the remaining seventeen acres.

"As the matter stands today under the contract, the Improvement Co. will have to go ahead with the cemetery, and will have to make some adjustment with Clark for the proposed three acres covered by the permit. Now, just consider what position in which Clark is placed by this change of program. Instead of 1200 shares of preferred drawing 7%, and 1200 shares of common, he proposes to take one-third of the common issue as payment for the land. If the Commissioner sticks to his $250.00 an acre, this will mean but 5000 shares, or at most, 6000 shares, making an allowance for the 20% brokerage which is to be paid on the other stock sold. He gets no preferred stock at all. He does not get back the $12,000.00 before any dividends could be paid to

the Improvement Co. on its holdings of common stock, if the Improvement Co. takes over the deal under the contract. It strikes me that your proposed ratio of three for Clark and seventeen for you is not equitable when viewed in the light of the now existing contract. Further, remember that under this new proposal there will be no common stock issued for the promoters as stock is sold.

"Frankly, *I believe that the now proposed set-up, and the one which I thought we had agreed to, that the Improvement Co. will have its money much earlier than is expected. In any event, if you don't get it within five years, plus your interest, you will at least own about 60% of the cemetery and will have had considerable paid on account.*

"I am enclosing a letter form of modification of contract which I trust that you and the other members of the Central Heights Improvement Co. will execute upon further consideration of the subejct. . . . "

Thereafter, on June 29, 1933, following further communications and discussions, appellant corporation executed and delivered to respondent Glouner a letter containing a proposed "modification" of the agreement of April 14th, substantially as follows:

"In consideration of your waiving your rights under and by virtue of the terms of said contract, (of April 14, 1933), Central Heights Improvement Co. agrees with you as follows:

"The certificates evidencing the ownership of Central Heights Improvement Co. of shares of the common capital stock of Memorial Parks, Inc., issued to it pursuant to the terms of said last named Company's application for a permit to sell and issue shares of its capital stock, will be escrowed with some agent to be agreed upon between you and Central Heights Improvement Co., and so escrowed upon the following terms and conditions:

"(1) The terms of the escrow shall be five (5) years from and after July 1, 1933:

"(2) If, during said period of time, Central Heights Improvement Co. has been paid, in dividends or otherwise, $34,000.00 plus 7% upon the principal sum thereof (and payments made on the principal sum to be deducted as and when made), all of such certificates shall be surrendered to you, or your nominees; otherwise, to be and remain the property of Central Heights Improvement Co. your right to receive any

or all of said certificates, or stock represented thereby to absolutely terminate on July 1, 1938. . . .

"(4) The stock issued said Central Heights Improvement Co. and the stock issued to Mr. Daniel B. Clark in accordance with the terms of said suggested modification of the contract of April 14, 1933, shall be pooled and shall be voted in all regular and/or special meetings of stockholders of Memorial Parks, Inc., as may be directed by a majority of the pool; provided, however, that so long as dividends have been regularly paid on the outstanding preferred stock, there shall be elected to the Board of Directors of said Memorial Parks, Inc., at least two persons designated by yourself and associate, two persons designated by Daniel B. Clark and/or his successors in interest, in the ownership of stock to be received by him as aforesaid, and two persons designated by the Central Heights Improvement Co. The remaining directors shall be elected by other owners of stock of Memorial Parks, Inc.

"Central Heights Improvement Co. has executed the foregoing letter in duplicate and encloses both copies thereof herewith. If you concur in the foregoing suggestions, please execute both copies and have Mr. Myers and Mr. Morrison likewise execute the same, returning one copy for our files and retaining one for your files. . . . ''

Upon the same date, and following the conferences mentioned, appellant corporation sent a letter prepared by attorney Goodcell to respondent Memorial Parks, Inc., in part as follows:

"In view of the refusal of the Commissioner of Corporations to issue to Memorial Parks, Inc., a permit in accordance with the terms and provisions of that certain contract between the Central Heights Improvement Co., a corporation, and Daniel B. Clark, a copy of which contract was filed by said Memorial Parks, Inc., with its application for permission to sell and issue shares of its capital stock, we submit for your consideration the following change in the terms of said contract:

"Central Heights Improvement Co. will deed to Memorial Parks, Inc., the seventeen acres of land described in said contract and said Clark shall deed to said Memorial Parks, Inc., the three acres described in said contract. *As the consideration for said deeds there shall be issued common stock of Memorial Parks, Inc., in such amount as the Commissioner*

*of Corporations of the State of California will approve,* one-third thereof to said Daniel B. Clark, and two-thirds thereof to Central Heights Improvement Co. Said application for permission to sell shares of its capital stock shall be amended by Memorial Parks, Inc., so as to provide for the sale of 2500 units of such capital stock, being two of preferred and one of common, at and for the gross selling price of $20.00 per unit, the same to net Memorial Parks, Inc. $16.00 per unit. The total amount received from the sale of said stock shall be used for the development of said twenty acres as a cemetery.

"No 'promotion stock' shall be issued to any person whomsoever.

"Central Heights Improvement Co. has executed this letter in duplicate and encloses both copies hereof herein. If Memorial Parks, Inc. and Mr. Clark concur in the foregoing suggestion, you both should execute two copies, returning one of them to us for our files and retaining the other for your files. . . . "

The proposals set forth by appellant in the above letters were duly accepted by respondents Glouner and Memorial Parks, Inc., by execution of the same as therein requested. Thereafter, on July 7, 1933, an amended application to issue stock was filed by respondent corporation with the corporation commissioner, and as a part thereof, appellant's letter of June 29th to Memorial Parks, Inc., was attached as an exhibit. No reference was made in the application to appellant's letter to Glouner of the same date. The application also contained as an exhibit a certified copy of an amendment to the articles of incorporation of Memorial Parks, Inc., conforming with the agreement of June 29th, relative to the issuance of stock, the period of default of dividends upon preferred stock, and in the event of such default, the domination of the board of directors by preferred stockholders. A permit to sell and issue stock of respondent corporation pursuant to this application was granted by the corporation commissioner, and thereupon appellant and respondent Clark deeded their seventeen acres and three acres, respectively, to Memorial Parks, Inc. Subsequently, 5,666 shares of stock, being appellant's agreed portion of the stock issue approved by the corporation commissioner, were issued in the name of appellant, and delivered in escrow by Glouner and his associates to Goodcell, pursuant to the agreement of June 29th, where

it still remains. In addition, stock to the approximate value of $39,000 was subsequently sold and issued to the public. In November, 1933, W. T. Bill and C. T. Norwood, president and vice-president of appellant corporation, were duly elected to the board of directors of respondent corporation, and appellant corporation thereafter continued to be represented thereon.

The cemetery venture failed to achieve the success that either its promoters or the officers of appellant hoped for it, with the result that at the annual stockholders' meeting in February, 1936, the preferred stockholders assumed control pursuant to the terms of the agreement of June 29th. Shortly thereafter appellant filed this action.

We have carefully examined the entire record in the light of appellant's voluminous objections, and are convinced the judgment must be affirmed. The trial court found that appellant and Clark entered into the agreement of April 14, 1933, with the contemplation that the same would not become binding upon the corporation to be organized unless and until a valid permit were obtained from the corporation commissioner to issue stock according to the forms of the agreement. That Clark, acting for himself and associates, paid appellant the sum of $6,000 and received title to three acres of land which he tendered with an assignment of his rights under the contract of April 14th, to respondent corporation, conditioned upon his receiving the stock as therein provided. That as a consequence of the refusal of the corporation commissioner to grant the original application for a permit to issue stock, respondent corporation never became a party to, nor bound by the agreement of April 14th. That by the subsequent agreements of June 29th, set forth in the letters of appellant, the agreement of April 14th was terminated and canceled. That none of the respondents were indebted to appellant, and that the latter had no lien as a vendor upon the property.

It will be observed from the pleadings that the question whether respondent corporation adopted and became bound by the contract of April 14, 1933, between appellant and Clark, was directly in issue. The court found that it neither adopted nor became bound thereby, and there is substantial evidence to support such finding. That a corporation may adopt the contracts made on its behalf by promoters, in advance of its organization, as effectively as if made by it

after incorporation, is recognized. The rule is not an absolute one, however. (*Biggart* v. *Lewis*, 183 Cal. 660, 665 [192 Pac. 437]; *Detwiler* v. *Clune*, 77 Cal. App. 562, 566 [247 Pac. 264].) In the instant action not only the terms of the agreement of April 14th, but the acts of the parties as well, convince us that the acceptance of benefits thereunder by respondent corporation, was expressly conditioned upon the permit from the corporation commissioner. (*Nannizzi* v. *Caprile*, 43 Cal. App. 498, 500 [185 Pac. 673]; *Michell* v. *Grass Valley Mines Co.*, 206 Cal. 609, 615 [275 Pac. 418].) The fact that the evidence shows that at the time of the filing of the original application to the corporation department for a permit, Clark had merely *tendered* the deed to his three acres, and an assignment of his rights under the April 14th agreement, further indicates the qualified act of respondent corporation.

■ The trial court admitted, over the objections of appellant, parol and extrinsic evidence consisting of conversations between the parties and Goodcell occurring before, during, and subsequent to the execution of the agreement of April 14th. The rulings were proper. The evidence was admissible, not to vary or modify the terms of the contract of April 14th, but for the purpose of aiding the court in ascertaining the true intent and meaning of the language used therein (*Payne* v. *Commercial Nat. Bank*, 177 Cal. 68, 72 [169 Pac. 1007, L. R. A. 1918C, 328]); "not by showing that the parties meant something other *than* what they said, but by showing what they meant *by* what they said". (*Barnhart Aircraft, Inc.*, v. *Preston*, 212 Cal. 19, 23 [297 Pac. 20]; *Wachs* v. *Wachs*, 11 Cal. (2d) 322, 326 [79 Pac. (2d) 1085]; *Lemm* v. *Stillwater Land & Cattle Co.*, 217 Cal. 474 [19 Pac. (2d) 785].) The pleadings placed before the court not only the contract of April 14th, but that of June 29th as well. An examination of the language of each reveals the difficulty confronting the trial court in the respect mentioned. ■ Furthermore, since respondent corporation was not a party to the agreement of April 14th, and its rights and liabilities thereunder were directly in question, it would seem that the objection would not properly apply in so far as the respondent corporation is concerned. (*Auditorium Co.* v. *Barsotti*, 40 Cal. App. 592, 595 [181 Pac. 413].)

■ Respondent corporation was permitted to show by oral and documentary evidence from an officer of the state

corporation department that it had filed an application for the issuance of stock pursuant to the agreement of April 14th and of the amended application therefor under the agreements of June 29th. The evidence was relevant and material as showing respondents' effort to comply with the condition set forth in the contract of April 14th, and the impossibility of performance in accordance therewith. (*Nannizzi* v. *Caprile*, *supra*; 500, 501; *Coalinga Mohawk O. Co.* v. *R. H. Herron Co.*, 53 Cal. App. 75, 78 [199 Pac. 813].) Evidence of the amended application, the granting of the same, and the issuance of stock pursuant thereto and to the agreements of June 29th, was admissible for the purposes offered. ▮ Nor was the evidence inadmissible as hearsay because appellant was not a party to the proceedings before the corporation department. The testimony and documents were received not as evidence of the truth of the matters therein contained or stated, but as evidence of acts of respondents which were required of them under the contract, and which formed a part of the entire transaction in dispute—as distinguished from that portion alleged in the complaint. ▮ When the good faith of a party is in question, the information upon which he acted, whether true or false, is original and material evidence, and admissible. (*Young* v. *Benton*, 21 Cal. App. 382, 390 [131 Pac. 1051]; *People* v. *Shea*, 8 Cal. 538, 539, citing Green. Ev., sec. 101; Code Civ. Proc., secs. 1850, 1870, subd. 7.) For the same reasons this evidence was not objectionable as being self-serving, since it merely related to specified acts which appellant itself contracted should be performed.

▮ The trial court, over appellant's objection, permitted a certified public accountant to testify that in his opinion as an expert, an entry made by another in respondent corporation's records indicated that the land in question had been acquired by respondent corporation in consideration of the issuance to appellant and respondent Clark of a total of 8,500 shares of its common stock. It might be added that the court permitted appellant to completely rebut this testimony through the testimony of a certified public accountant called as an expert witness in its behalf. The objection should have been sustained. Obviously, the particular entry in the corporate records was the expression of the party making the same, and the testimony of the experts amounted to nothing more than an opinion as to the understanding or belief of another.

(*Huyck* v. *Rennie,* 151 Cal. 411, 415 [90 Pac. 929].) The point is not analogous to that presented in *Law* v. *Northern Assur. Co.,* 165 Cal. 394, 402 [132 Pac. 590], which involved the interpretation of technical terms in a contract between the parties to the action. The error, however, is not such as to require, or warrant, a reversal of the judgment.

■ Great stress is placed upon the contentions that the findings are not supported by the evidence; that they are at variance with the pleadings, are contradictory and incomplete as to material issues presented. Sufficient of the evidence has been heretofore presented herein to dispose of the first contention. As to the variance claimed, the same is more apparent than real. As above noted, respondent corporation alleged that the only contract between appellant and respondent corporations was that of June 29, 1933, and that this contract and that of the same date between appellant and Glouner changed the terms of the agreement of April 14th between the parties thereto. The court found substantially in accordance with these allegations except that it found that the agreements of June 29th "terminated and cancelled" the agreement of April 14th as between the parties thereto. The allegations of the amended answers were sufficiently broad to present to the court the interpretation of the agreements mentioned therein, and its finding is one of an ultimate fact and within the issue thus presented by the pleading. (*Brady* v. *Fowler,* 45 Cal. App. 588, 592 [188 Pac. 319]; *Starkweather* v. *Eddy,* 87 Cal. App. 92, 98 [261 Pac. 763]; *Taylor* v. *Taylor,* 192 Cal. 71, 81 [218 Pac. 756, 51 A. L. R. 1074].) ■ The court found in paragraph XIII that the allegations of paragraph VI of the amended answer of respondent corporation were true, thus finding by reference that Clark "tendered and delivered" to it his deed to the three acres, together with an assignment of his rights, duties and obligations under the agreement of April 14th. In paragraph XIV, subdivision f, the court expressly found that on or about the 8th day of May, 1933, Clark "tendered" to respondent corporation his deed to the three acres, together with an assignment of his right, title and interest in, to, and under the agreement of April 14th. By paragraph XIV, subdivisions g and h, the court further found that the agreement was executed and the tender of the deed was made conditional for its acceptance by respondent corporation upon the securance of a per-

mit from the corporation commissioner. The court then found that the permit was denied, as alleged in the amended answer. It is apparent that the question whether there was a mere tender or a tender and delivery of the deed is not such a material issue as to render the conflict fatal to the judgment. (*Wiles* v. *Hammer,* 66 Cal. App. 538, 540 [226 Pac. 651].) Since the court expressly found that the tender—or tender and delivery, if such there were—and the contract from which they necessarily arose, were conditioned upon an event which never occurred, the determination whether there was a tender or delivery, or both, is not such an essential conflict as to justify a reversal. (*Turner* v. *Wilson,* 171 Cal. 600, 606 [154 Pac. 2].) Further, since the court specially found that there was only a tender, it would appear such finding must control. (*McCormick* v. *National Surety Co.,* 134 Cal. 510, 511 [66 Pac. 741] ; *Hammond Lbr. Co.* v. *Barth Invest. Corp.,* 202 Cal. 606, 609 [262 Pac. 31].)

 It is likewise contended that the court failed to find upon certain issues presented by the allegations set forth as an affirmative defense in the amended answers of other respondents. An examination of the findings reveals that the court found substantially in accordance with the facts alleged as an affirmative defense in the amended answer of respondent corporation. It necessarily follows that allegations in the answers of other respondents in conflict therewith must be deemed to have been found untrue, without an express finding to that effect. The court found that at the time of the execution of the agreement of April 14th, the reasonable value of the land was the sum of $5,000. Since no issue was involved as to the value of the land, the finding was wholly surplusage, but certainly harmless in character.

 The court found that appellant deeded the seventeen acres to respondent corporation and received "as full consideration for said transfer and as the only payment therefor due and payable from respondent Memorial Parks, Inc., to appellant, fifty-six hundred sixty-six (5666) shares of the capital stock of said respondent . . . " and as a conclusion of law, that appellant had no vendor's lien, or any other right or interest in the property. The evidence clearly supports such finding. The agreements of the parties, of June 29, 1933, and their subsequent conduct pursuant thereto, are so clearly inconsistent with, and even repugnant to the theory

of a vendor's lien as to have precluded a different conclusion by a court of equity. (*Royal Con. Min. Co.* v. *Royal Con. Mines,* 157 Cal. 737, 747 [110 Pac. 123, 137 Am. St. Rep. 165]; *Jones* v. *Allert,* 161 Cal. 234, 237 [118 Pac. 794]; *Doty* v. *California Rice Milling Co.,* 37 Cal. App. 449, 460 [174 Pac. 389]; *Cowan* v. *Security-First Nat. Bank,* 10 Cal. App. (2d) 390, 393 [51 Pac. (2d) 440].)

The judgment is affirmed.

Pullen, P. J., and Thompson, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 7, 1940.